J-A06016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| K.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| N.(S.)V. | : | No. 1062 WDA 2020 |

Appeal from the Order Entered September 11, 2020
In the Court of Common Pleas of Blair County Civil Division at No(s):
No. 2014 GN 2400

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.:                **FILED: JUNE 4, 2021**

K.S. ("Father") appeals from the order, entered in the Court of Common Pleas of Blair County, denying his petition to modify a custody order and granting N.(S.)V. ("Mother") sole legal custody with respect to decision-making for their minor child, S.S. ("Child").  Upon careful review, we vacate and remand the case to the trial court to amend the order in accordance with the dictates of this memorandum.

Father and Mother are the parents of two children, E.S., now an adult, and Child, who is 16 years of age and the subject of these proceedings.  The parties were married on July 31, 1999, and separated on August 20, 2014.  Their divorce became final on February 28, 2018.  By order dated August 4, 2015, Father was awarded primary physical custody of both children, with Mother receiving partial custody.  After Mother moved to modify the custody arrangement, the court awarded shared (50/50) legal and physical custody to

the parties on January 31, 2018. Shortly thereafter, on August 28, 2018, Father filed the instant petition to modify, again seeking primary custody of both children.[1] Three hearings were held. The first two hearings were conducted by the Honorable Daniel J. Milliron, who subsequently recused himself after Mother contacted President Judge Elizabeth A. Doyle with concerns regarding perceived bias on Judge Milliron's part. The case was reassigned to the Honorable Hiram A. Carpenter, III, who presided over the third and final hearing. On September 11, 2020, Judge Carpenter entered an order, with accompanying opinion, denying Father's motion, maintaining the 50/50 physical custody arrangement, and granting Mother sole legal custody of Child with regard to decision-making. This timely appeal ensued, in which Father raises the following issues for our consideration:

1. Did the trial court err and/or abuse its discretion in failing to grant primary physical custody of [Child] to [Father] under all the facts and circumstances of this case and the law applicable thereto?

2. Did the trial court err and/or abuse its discretion in awarding to [Mother] sole legal custody for decision[-]making for [Child] under all of the facts and circumstances of this case and the law applicable thereto?

3. Did the trial court err and/or abuse its discretion in failing to address other important aspects of legal custody[,] including, without limitation, access to educational and medical providers and records, and the right to be advised of emergency situations?

---

[1] In the intervening period between the filing of the motion to modify and the court's decision, E.S. attained her majority.

4. Did the trial court err and/or abuse its discretion in failing to include in its order necessary and appropriate custody provisions that were contained in the prior custody order in this case?

Brief of Appellant, at 7-8 (unnecessary capitalization omitted).

Our well-settled scope and standard of review are as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F.*, *III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*M.A.T. v. G.S.T.*, 989 A.2d 11, 18-19 (Pa. Super. 2010) (en banc) (internal citations omitted).

Finally,

[t]he parties cannot dictate the amount of weight the trial court places on the evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009).

We will address Father's first two claims together. Father alleges that the trial court erred in failing to grant him primary physical custody and in granting Mother sole legal custody of Child with respect to decision-making. Father alleges that Child thrived while in his primary custody between August 2014 and January 2018, but Child's academic performance and extracurricular participation have deteriorated since the court instituted the shared custody arrangement. Father alleges that Mother's statements and actions caused his relationship with E.S. to deteriorate to the point that they currently have no relationship, and he wishes to prevent a similar deterioration in his relationship with Child. Father asserts that Mother's parenting skills are too permissive and that she has allowed Child to make decisions regarding his academics and extracurricular activities that are not in Child's best interests. Father claims that he is the only parent who attends Child's school and extracurricular activities, parent/teacher conferences, and awards ceremonies. Father ensures that school assignments are completed, monitors Child's grades, and communicates with Child's teachers.

Mother, who filed her appellate brief *pro se*, counters that "any decline in [Child's] grades is more likely because of his being a teenager, the course work getting more difficult (Father forcing him into honors classes that he didn't want to take and against teacher's recommendation) and considering the four baseball leagues, ERA [baseball program] and [Boy] Scouts that [Child] was involved in, that he did not have adequate time to study." Brief of Appellee, at 9. Mother argues that she is very supportive of Child and his

education and activities and that Father attempts to "dictate or control what [Child's] interests or activities should be[.]" *Id.* at 10. Mother asserts that "it is Father's own actions that have caused the deterioration of his relationship with [E.S.]" and that she "tried to warn Father on several occasions that his behavior was affecting the children." *Id.* at 7.

In child custody cases, the paramount concern "is the best interests of the child." *C.G. v. J.H.*, 193 A.3d 891, 909 (Pa. 2018). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral[,] and spiritual well-being." *M.J.N. v. J.K.*, 169 A.3d 108, 112 (Pa. Super. 2017). Section 5328(a) of the Child Custody Act sets forth the best interest factors that the trial court must consider in awarding custody:

§ 5328. Factors to consider when awarding custody

(a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a) (1-16).

We begin by noting that the relationship between Father and Mother has been, and continues to be, a contentious one. As the parties acknowledge, they have very different parenting styles—Father focuses on achievement and, in doing so, may tend to push Child into things he might not be interested in doing, whereas Mother has a more laid-back parenting style, placing greater importance on her children's happiness. It is this clash in parenting styles that led to Father filing the instant petition for modification, based on his belief that Mother's more *laissez faire* attitude has led to a decline both in Child's academic performance and his interest in extracurricular activities. The trial court was placed in the difficult position of reconciling the effect of these disparate personalities on Child's academic and personal development and fashioning an order that would serve his best interests going forward.

To that end, the trial court addressed each of the custody factors. The court concluded that factors one (parent more likely to encourage contact with other party), three (parental duties performed by each party), four (need for stability and continuity in child's life), five (availability of extended family), six (child's sibling relationships), seven (well-reasoned preference of child), eleven (proximity of parties' residences), twelve (parents' ability to care for child), fourteen (history of drug/alcohol abuse by parties), and fifteen (mental/physical condition of parties) were either non-issues or weighed equally with respect to both parents. *See* Trial Court Opinion, 9/11/20, at 13, 16-20, 32-33.

The court focused its analysis most heavily on factor eight (attempts of a parent to turn child against other parent), deeming it "by far the most important consideration in this case." ***See id.*** at 20. In its discussion of this factor, the court rejected Father's contention that his "wonderful relationship . . . with his two children was destroyed by [M]other's actions within a short period of time after they were placed in the 50/50 custody arrangement." ***Id.*** at 22. Rather, the court concluded—based on the extensive testimony in this matter—that the recent difficulties experienced by Father in his relationship with his daughter, as well as Child's current attempts to assert his own independence, were caused by Father's own controlling behaviors.[2] ***See id.*** at 23. The court observed:

> [F]ather has what seems at first blush to be a wonderful strength in terms of his willingness to [be] involve[d] with his children in their activities. If that w[ere] all we were talking about, it is an involvement that any parent could be justifiably proud to claim. However, the weakness in [F]ather's approach is reflected again and again throughout the record. It is the reality that the children never get to make any decisions on their own. Worse, they cannot experiment with an activity, decide they do not like it any longer, and withdraw. . . . Thus, the admirable quality of parental involvement and encouragement becomes [a case of F]ather exhibiting dominance not only in picking their activities but not letting them out of them when they change their mind[s] or grow in a new way. It is clear from [E.S.'s] behavior and what we are now seeing in [Child] that these children are unable to

---

[2] The court essentially incorporates by reference its discussion of factor eight into its findings with regard to factor two (present and past abuse committed by a party), noting that Mother had characterized Father's behavior towards E.S. as "abusive" and that Mother believes that "some of the same complaints she heard from [E.S.] leading to [E.S.'s] estrangement from [F]ather are now beginning to surface with [Child]." Trial Court Opinion, 9/11/20, at 15.

communicate this frustration to [F]ather. Once the shared custody came into effect, however, the children soon saw [their M]other as empowered and (increasingly) rebelled. It is that simple and so obvious that no other conclusion is reasonably possible. . . .

[F]ather has had too much control for too long. It is beyond obsessive. There comes a time when children have to make their own decisions about their activities and cannot be the subject of total parental control. They actually need this opportunity, while [F]ather has insisted that they remain children subject to his dictating what they will be doing.

*Id.* at 24, 25-26 (emphasis in original). The court concluded that factor eight favored Mother.

Similarly, the court concluded that factor nine (party more likely to maintain loving, stable, consistent, and nurturing relationship with child) favored Mother. The court observed that, "given what has happened, nothing is more important at this juncture than [Child] learning to make some of his own decisions," which will "never happen with [F]ather as primary care parent if he maintains his present attitude[.]" *Id.* at 30-31. The court concluded that, while Father's "never quit" philosophy may result in a "stable relationship, it is far from the consistent and nurturing relationship which meets [C]hild's emotional needs. In fact, it seems to meet [F]ather's needs." *Id.* at 31.

Likewise, the court weighed factor ten (party more likely to attend to physical, emotional, developmental, educational, and special needs of child) in favor of Mother. The court observed that "[F]ather's approach with [Child], when he was much younger, may have been successful, . . . [however, Child]

needs to be empowered to make some decisions ([] even some [F]ather does not like) in the interest of his total development." *Id.*

Finally, the court found factor thirteen (level of conflict and willingness/ability of parties to cooperate) also favored Mother. The court acknowledged that "this is a high conflict case" and "there is a tremendous problem with communication between the parents." *Id.* at 32. However, the court once again concluded that Father's controlling behaviors bled over into his ability to communicate not only with Mother, but with his children.

We note that Judge Carpenter is not the first jurist involved in this case to express concern over Father's behavior and its effect upon his relationship with his children. As far back as 2015, Judge Milliron—despite awarding primary physical custody to Father based largely on his ability to provide stability—observed that:

> Father's pattern of behavior [] has expressly attempted to alienate both children from Mother. . . . Father's conduct in response to his [w]ife's departure has been to exercise every opportunity to punish Mother for this decision. While Mother's feelings for her [h]usband and marriage have evolved, her love for her children has not. Father understands this tight emotional maternal bond continues and has exercised significant effort to "punish" Mother in this area. There have been numerous opportunities for Father to promote or encourage a positive relationship between his children and their Mother. Instead, Father has allowed his own interests of punishing Mother to prevail. . . . This [c]ourt is convinced that if Father does not change his negative conduct towards Mother, then as the children mature, they themselves will recognize the detrimental impact of their Father's behavior.

Trial Court Opinion, 7/28/15, at 6, 7-8, 14.

We have reviewed the extensive transcripts of testimony in this case and conclude that Judge Carpenter's findings in support of his decision to deny Father's request for primary physical custody, and to grant Mother sole legal custody regarding decision-making, are supported in the record. **C.R.F., III**, **supra**. It is clear that Child is now at an age where he must be empowered to make some of his own decisions, where appropriate, and to take some level of responsibility for his own destiny. This will not occur in a situation where he is under the thumb of a parent who—even with the best of intentions— seeks to control his choices at every turn. Accordingly, we find the court's decision to award Mother sole custody "regarding decision[-]making" appropriate.

However, as Father correctly notes in his final two claims on appeal, the trial court's custody order is silent as to other aspects of legal custody addressed in prior orders, including access to medical, dental, religious, and school records, addresses, and other vital information concerning Child's welfare. **See** 23 Pa.C.S.A. § 5336(a)(1). Moreover, given the historically contentious nature of the parties' relationship and their continuing inability to successfully communicate, the omission of certain provisions included in the January 31, 2018 order[3] is concerning. Accordingly, we are compelled to

---

[3] Because the trial court's September 11, 2020 order rescinded all previous orders and did not, either explicitly or by reference, incorporate the following provisions, they are no longer in effect:

6.  The [Child] shall attend the Hollidaysburg Area School District unless the parents mutually agree otherwise.

. . .

8.   Each party shall keep the other informed of their current address and phone number.

. . .

11.  The parties shall not argue or engage in heated discussion in the presence of [Child].

12.   Neither party shall engage in any conduct which presents to the [Child] a negative or hostile view of the other nor shall they allow any third party to do or say anything that would impair the natural love and respect of the [Child] for either party.

13.   Each parent shall encourage the [Child] to comply with this parenting agreement and foster in [Child] a positive view of the other.

14.   The party who has physical custody of the [Child] should encourage, prepare[,] and have [Child] available at the designated times and places so visitations can occur smoothly. Likewise, the party exercising partial custody or visitation rights should encourage, prepare[,] and return [Child] promptly at the designated times and places.

15.  THE PARTIES MAY DECIDE DIFFERENT TIME ARRANGEMENTS AND MAKE DECISIONS FOR [CHILD] WHENEVER THEY MUTUALLY AGREE TO DO SO.  NOTHING IN THIS ORDER IS UNDERSTOOD TO RESTRICT THE ABILITY OF THE PARTIES TO MUTUALLY AGREE ON ALTERNATIVE PARENTING ARRANGEMENTS.   IF FOR ANY REASON THE PARTIES CANNOT AGREE, THE TERMS OF THE CONSENT AGREEMENT WILL BE FOLLOWED.

. . .

17.  VIOLATION OF THIS ORDER BY ANY PERSON MAY RESULT IN CIVIL AND CRIMINAL PENALTIES, INCLUDING PROSECUTION PURSUANT TO SECTION 2904 OF THE PENNSYLVANIA CRIMES CODE, INTERFERENCE WITH CUSTODY OF CHILDREN.

remand this matter to the trial court for the entry of an order clarifying Father's right to the information referenced above and including, as the court deems necessary, the language referenced in footnote 3 hereof.

Order vacated; case remanded with instructions to amend in accordance with the dictates of this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/04/2021

---

18. Jurisdiction of [Child] shall remain with the Court of Common Pleas of Blair County, Pennsylvania, unless jurisdiction would change under the Uniform Child Custody Jurisdiction Act.

19. NOTICE OF OBLIGATIONS BEFORE YOU RELOCATE: No party shall relocate with [Child] unless every individual who has custody rights consents to the proposed relocation, or the court approves the relocation. Any party who desires to relocate with [Child] shall first notify every other individual who has custody rights. The party who desires to relocate with [Child] must also comply with 23 Pa.C.S. [§] 5337 et seq. (A copy of this statute is available in the Blair County Custody Office.)

Trial Court Order, 1/31/18, at 15-16 (capitalization in original).