J-S03031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.R. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| C.J.R. | : | |
| | : | |
| Appellant | : | No. 785 WDA 2021 |

Appeal from the Order Dated June 17, 2021
In the Court of Common Pleas of Fayette County Domestic Relations at
No(s): 1937 of 2019 GD

BEFORE: LAZARUS, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED: FEBDRUARY 24, 2022**

C.J.R. (Father) appeals from the order entered in the Court of Common Pleas of Fayette County (trial court) granting J.R. (Mother) primary physical custody of the parties' daughter, C.R. (born 5/11) and their son, M.R. (born 10/13) (collectively, Children) during the school year and allowing their relocation from Uniontown, Pennsylvania, to Flint, Michigan.[1] Father challenges the trial court's assessment of the statutory custody and relocation factors and its determination that supervision is necessary for his periods of partial custody. We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Father is from Uniontown and Mother is from Flint.

**I.**

**A.**

The parties met in 2010 in North Carolina where Father was then stationed in the Marine Corps. During their relationship, Father was deployed to Afghanistan for several months, at which time Mother moved back to Flint and gave birth to C.R. When Father returned, they resided together in North Carolina and then in Louisiana, where Father was stationed. The couple's relationship was always conflict-laden and they attempted to reconcile when Mother learned she was pregnant with M.R. in March 2013. They resided in Louisiana until Father left the Marine Corps in April 2015 and moved to Uniontown where they continue to live together. They were married in August 2016.

**B.**

Mother filed a complaint in divorce and notice of relocation in fall 2019 seeking to relocate Children to a four-bedroom home in Flint owned by her father. Father filed a counter-affidavit opposing the relocation. The trial court held a trial *de novo* over two days in January 2021 at which several witnesses testified, including Mother, Father, Children and S.S., a former girlfriend of Father.[2]

Mother testified that she is employed full-time by Dick's Sporting Goods in a management position. She typically works a ten-hour, five-day per week shift

---

[2] At the time of trial, there was a custody order in effect through a North Carolina court awarding Mother primary custody of C.R. The order did not address M.R.

and her employment would transfer upon relocation. Mother recounted that in March 2018, Father's drug use began to impact Children because he would smoke synthetic marijuana and exhibited "zombiefied behavior, so he wasn't necessarily aware of where my kids were and what was going on with them if he did have them in his care." (N.T. Trial, 1/08/21 at 50). Although Mother and members of Father's family urged him to enter a rehabilitation facility, he refused and continued abusing substances. Mother testified to her firsthand knowledge of Father's drug use after she filed for divorce in that she "found him passed out in the driveway sleeping multiple times [and] found a bottle of what had marijuana in it." (*Id.* at 53). Mother described photographs of Father introduced into evidence as exhibits depicting him "on synthetic marijuana at all hours of the night sleeping in the car [and one photograph showing] him passed out in the car with a bowl . . . he had his pants undone with his private area out." (*Id.* at 55). Mother explained that Father was fired from his job at Console Mine because of his substance abuse and his affair with another employee. He is currently self-employed hauling junk loads and firewood delivery through a business he started with his father.

Mother testified that since she filed for divorce, Father has made several changes to the condition of the marital home to make it essentially unlivable, including ripping "everything out" of the kitchen so that "there is no working sink, no counter tops . . . the ceiling is open and exposed." (*Id.* at 63). Father has thrown some of Mother's belongings away out of anger and displays his firearms, knives and a hatchet openly on walls in the basement accessible to

Children. Mother described an incident in which Father burned materials in the fireplace other than wood and "the whole house filled with smoke and I couldn't breathe it was in my chest." (*Id.* at 66). Mother became fearful of Father and sought police assistance when he set up cameras pointing at the living room sofa where she sleeps and went into a "manic episode" slamming things in the house. (*Id.* at 67).

Mother recounted that when she and Father initially discussed divorce, he indicated that she could have custody of Children and he understood why she no longer wanted to reside in Uniontown. Because they could not agree on child support and tax issues, Father retracted his initial position. Mother's brother, sister and large extended family live in Flint and they are very supportive of her and Children. Mother attended the same school district that Children would enroll in and she has researched local medical care providers and extracurricular activities for Children. Mother stated that she has always met the everyday needs of Children by taking them to appointments and lessons and communicating with teachers.

Mother acknowledged that the drive from Uniontown to Flint is six hours but testified she believed Father's relationship with Children could be preserved, and that he and his family are welcome to visit Flint at any time. Mother is willing to meet at a halfway point to drive Children to Father and he can talk with them on the telephone on a daily basis. Mother testified to her belief that the move would not negatively impact Children, and that while she refrains from speaking to them about the divorce, Father has "screamed and yelled and thrown

- 4 -

things to where the kids are afraid." (*Id.* at 87). Mother has no support system in Uniontown but has a large support system in Flint and cost-free childcare through family. Mother testified that Father has been absent for much of Children's childhoods, preoccupied with drug use and other women, while she has put Children first and will continue to do so.

Father testified that he served in the Marines for nine years and had difficulty adjusting to civilian life after leaving the military. He acknowledged, "I smoked synthetic marijuana heavily. It started more as a recreational thing, I became addicted to it [. . . in the] summer of 2010." (*Id.* at 183). Father decided to "get clean" in February 2017 because "I didn't know who I was anymore. . . and realized 'listen buddy you need to do something better or you're going to be dead.'" (*Id.* at 184). Father explained that he participated in mental health and drug addiction counseling for about one year after he was arrested for resisting arrest while he was driving intoxicated. Father indicated that he was fully sober from February 2017 through January 2020, but that he then smoked medical marijuana and took "four or five oxycodone" tablets that had not been prescribed to him because he had injured his elbow and hand. (*Id.* at 187).

Father stated that he has never smoked in front of Children nor driven while he was high, and that he is willing to participate in counseling again. He admitted to sleeping in his car "countless" times because he was hiding his drug addiction. (*Id.* at 199). Father represented that he began remodeling the marital home to help with sleeping arrangements after he and Mother separated,

and that during the kitchen remodel, the home was without running water in that room for only ten days.

Father operates a business with his father and "hauls things [such as] gravel, firewood, mulch, junk." (*Id.* at 200). He testified that he lost his former employment in March 2020 because of the economic downturn. Father stated that Children excel in school, that he and Mother assist with school work, and that he has taken the lead with extracurricular activities when Mother has to work. Father described himself as a very involved parent with a supportive extended family in in Uniontown.

S.S. testified that she dated Father for one year and that he initially spent every night at her home.[3] After he was fired from his job in March 2020, Father was at her house for 14 to 16 hours every day. S.S. described Father's behavior as "erratic" and she "was petrified that he was taking too many pills." (*Id.* at 143). S.S. testified to Father's angry outbursts and use of oxycodone prescribed in the names of other people. In one instance, "he kept chattering his teeth a lot . . . he would repeat everything that he was saying and bouncing around and using power tools. . . . at three in the morning." (*Id.* at 144). S.S. personally observed Father detox on her sofa four different times during their relationship. She recounted that Father took pills in the days prior to a vacation he had planned with Children and drove "the kids any way on zero sleep in the middle

_____

[3] The trial court found S.S. to be a credible witness despite the circumstances of her prior relationship with Father.

of the night. He was texting me the entire time he was driving and the one text I got was telling me how not only did he just take hydrocodone but also was smoking a bowl while driving, drinking coffee and the kids were passed out in the backseat on the way to the beach." (*Id.* at 148). While on vacation, he told S.S. that he took mushrooms and he talked about his drug use daily.

C.R. was nine years old at the time of trial and M.R. was seven years old. C.R. testified that she has a good relationship with and loves both of her parents, and that Mother and Father do not say negative comments about one another to her. However, she is aware that "they are fighting . . . [and] don't really talk too often[.]" (*Id.* at 20-21). M.R. testified that he loves and does fun activities with both of his parents. Children indicated that they like to spend time with extended family members on each side of their family.

On June 17, 2021, the trial court entered its Opinion and Order awarding Mother primary physical custody of Children during the school year, subject to Father's partial physical custody during school summer recesses/breaks and alternating holidays. The Order also provides for Father's periods of custody to be supervised by his mother or any member of his immediate family, and requires him to undergo a drug addiction/psychiatric evaluation and to follow treatment recommendations, with a successful completion goal of lifting the supervision requirements.

In its opinion, the trial court discussed the relocation[4] and custody factors[5] and found that Mother's move could be accomplished while preserving Children's

_____

[4] Section 5337 of the Domestic Relations Code requires that the trial court consider the following factors when a party is relocating:

> **(h) Relocation factors.**—In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:
>
> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
>
> (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
>
> (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.
>
> (4) The child's preference, taking into consideration the age and maturity of the child.
>
> (5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.
>
> (6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.
>
> (7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

_____

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h)(1)-(10).

[5] Trial courts must consider the following factors in rendering a custody determination:

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

relationship with Father and his extended family through periods of partial physical custody. In doing so, the court found that while Mother has strived to provide a stable, wholesome environment for Children and is open to working

---

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16).

with Father to preserve his bond with Children, Father has done little to provide a happy life for them in that he has expressed intense anger at Mother, engaged in multiple affairs causing him to spend time away from the family, and developed a drug addiction that has been detrimental to the family as a whole and constitutes a significant safety risk for Children, particularly with regard to transporting and travelling with them.  Father timely appealed and he and the trial court complied with Rule 1925.  *See* Pa.R.A.P. 1925(a)(2)(i)-(ii).

## II.

On appeal, Father contends the trial court failed to adequately analyze the ten relocation and the 16 custody factors in that it summarily discussed or omitted many of the enumerated factors.  Father claims the custody arrangement is not in Children's best interests and the trial court ignored the stable, well-adjusted lives they lead in Uniontown by permitting relocation.  Father maintains that he has been honest about his synthetic marijuana addiction and the trial court afforded too much weight to his drug issue, while failing to give appropriate weight to his role as a dedicated and loving father to Children.  Father further contests the conditions of supervision as harsh and draconian, given that he agreed to additional drug and mental health counseling.[6]

_____

[6] When reviewing child custody orders,

> our scope is of the broadest type and our standard is abuse of discretion.  This Court must accept findings of the trial court that are

"With any child custody case, the paramount concern is the best interests of the child." ***D.K. v. S.P.K.***, 102 A.3d 467, 474 (Pa. Super. 2014) (citation omitted). "The determination of a child's best interests involves the consideration of all relevant factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being." ***Id.*** (citation omitted). Additionally, as the custodial parent seeking to relocate Children in this case, Mother had the burden of establishing that relocation is in their best interest. ***See*** 23 Pa.C.S. § 5337(i)(1)(setting forth burden of proof).

Instantly, the record is replete with evidence demonstrating Father's longtime drug addiction and anger issues. While Children clearly love both of their parents, Mother has shown that she is committed to maintaining their well-being and is willing and able to provide for their overall stability. Mother has an extensive family support system in Flint, cost-free childcare while she works, and is able to reside in her father's large home with Children. This sharply

_____

supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and **weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses firsthand**. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***M.J.N. v. J.K.***, 169 A.3d 108, 111–12 (Pa. Super. 2017) (citations omitted; emphasis added).

contrasts with Mother's complete lack of support system in Uniontown and dysfunctional living arrangement in the martial home, both from an emotional and practical standpoint, in view of her contentious relationship with Father and his constant "remodeling." Trial Court Opinion, 6/17/21, at 3. At the present time, Father appears incapable of providing the same consistency and level of care for Children in meeting their daily needs given his continued struggle with drug addiction, anger management issues, erratic behavior and overall preoccupation with himself. *Id.* at 15-16.

Although Father contends that the trial court cursorily discussed and overlooked entirely some of the relocation and custody factors, our review of the record does not confirm the same. Instead, reading the Opinion and Order as a whole and viewing it in the context of the testimony in this case, it is clear that the court fully considered all relevant factors in rendering its decision that primary physical custody of Children appropriately lies with Mother in Flint.

With regard to Father's challenge to the weight the trial court afforded evidence of his drug use, as we previously noted, our standard of review makes clear that concerning issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. *See M.J.N. supra*, at 112. As to the court's imposition of "draconian" supervision requirements, we find that the Order is instead flexible concerning the family member who provides supervision, and that it includes a means of removing the supervision requirement altogether upon Father's successful completion of treatment. In sum, we conclude that substantial evidence

supports the findings of the trial court and its decision to award primary physical custody of Children to Mother and permit their relocation to her hometown of Flint, subject to Father's periods of partial physical custody in Uniontown. Father's arguments to the contrary merit no relief.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/24/2022